That is case number 15-1139, Estrada-Martinez v. Lynch. Mr. Wachowiak, am I saying that properly? It's Wachowiak, Your Honor. Wachowiak, thank you. Thank you. May it please the Court, my name is Phil Wachowiak and I represent the petitioner, Rufino Estrada-Martinez, along with my co-counsel, Kirk Abel. As well, we are here on behalf today of the West Virginia University College of Law Immigration Clinic. Your Honors? And we really thank you for being here. Thank you. Thank you, Your Honor. Your Honors, we have a citizen from Honduras who has fled his home country because the police tortured and threatened his family with death. They burned him with car batteries, they turned him upside down and beat him. Estrada has shown before two judges and before a hearing that he will face torture and death if he returns. He first did this in 1995 when he was granted asylum. He did it again in March of 2014 before a reasonable fear and credibility. And he did it most recently in August of 2014 before the immigration judge, who found him credible and canon. We are here today. Was there any evidence that Mr. Estrada was ever in any danger in Honduras once he relocated there? Once he relocated, Your Honor, there is a reference in his asylum application that a fellow Lancapacino was taken by the police and was tortured and the police were asking where Mr. Estrada-Martinez was. He refused to devolve that information. Additionally, in 2006, Mr. Estrada received a letter from his father that stated that Avilio Martinez, the man who owned the land originally, was indeed looking for him, that his sons were in the police department and that they could easily find him. Additionally, in 2014, Mr. Estrada received a letter from a fellow Lancapacino who was involved in the original invasion in 1994 who stated that if Mr. Estrada returns, he faces the risk of torture and disappearance, which we all know means death. And so he has received threats since he initially left the country in 1994. Additionally, the human rights reports note that this is still going on in Honduras, that it may have been 20 years since these events have occurred, but since 2009, 90 individuals who were involved in land invasions have been killed in Honduras. This is still an active issue. We are here today because the BIA applied a categorical analysis in all but name when they found Mr. Estrada's aggravated felony to be particularly serious. A categorical analysis is the improper standard, both congressionally and found through case law. Estrada's felony is not particularly serious. He served absolutely no prison time for his crime, and the findings in the record support this. And had the BIA used the correct standard, it should have come to the same conclusion that the IJ came to, that he is eligible for withholding under INA and Convention Against Torture. Counsel, the BIA did, in its opinion, go through the relevant factors, correct? Yes, it did list them. They weighed them quite differently from the way you think they should have and differently than the IJ did, right? We argue that they didn't weigh the factors at all. They merely listed them. I understand your argument. Yes. But they identified them, discussed them, reached a conclusion different from yours. I guess my question is, it's what you're getting at, but I have trouble seeing how we have jurisdiction over a review of that determination, and if we do, how we would not have jurisdiction over any other application of a multi-factor test. Yes, Your Honor. The BIA ignored vast and several evidence, and it is noted in this Court's case in today's Beholder, which we submitted before the Court after our reply brief, that ignoring testimony and evidence can be considered a question of law, which this Court does have jurisdiction over. And there are vast pieces of information that were ignored by the BIA. For example, the BIA found it clearly erroneous that the IJ found that Mr. Estrada did not know the age of the victim in this case. However, if one looks at the record, it is noted that, and that was because the BIA said that he did not use an affirmative defense, that he did not know the age of the victim. But Mr. Estrada did not use an affirmative defense because there was never a bench trial. There was never a jury trial. This was clearly a plea bargain. He was only charged with one account of the three that were thrown against him. He only spent four years on probation instead of three to seven years in prison. Clearly there was a plea bargain here, and yet the BIA does not do any analysis of this. They just say because he didn't use a plea bargain that the IJ's finding was clearly erroneous. Additionally, the BIA applies a categorical analysis when it looks at the age of the victim. The IJ spends an analysis noting that it makes a difference whether the victim was 13, 14, or 15, or 16. In this case, the victim was 16 years old. The BIA notes that it states that there is no difference. It doesn't matter to them whether she's 13 or 16. And that is a categorical approach. They are not using the proper analysis as requested by MS. It should be done under congressional law and through case law. Another example of evidence that is left alone by the BIA is that the IJ found that this was a conceptual relationship. It was conceptual outside of the law, yes, but this had gone on for quite some time. This was not a forced relationship. And the BIA spends no time considering that Mr. Estrada Martinez is not a recidivist. He has never been in this kind of trouble again since 1996. He has never been charged with a sex crime. He served his four years probation satisfactorily, and he spent his ten years on the sex offenders list also satisfactorily. So how do we tell the difference between this application of a multifactor test and one over which we would not have jurisdiction? Your Honor, the factors in NAM state that you must consider all relevant details, all matters that are related to this case. And the BIA does not do that. The IJ, however, did. It looked at all these various important pieces of evidence and factors that were related directly to this case. Congress, in an adepto when they amended that in 1996, said that there must be a case-by-case specific analysis of all the underlying circumstances of the crime. And that was simply not done at the BIA level, but, however, was done at the IJ level. In the alternative, should this Court not find jurisdiction under the INA and CAT withholding, this Court does have jurisdiction over CAT deferral. And Mr. Estrada meets that standard. More than likely than not, if he returns to Honduras, he will be tortured. Again, the BIA ignores important pieces of information. As I mentioned before, the 2014 letter he received from a fellow land campesino that should he return, he will face the risk of torture and possible death, the 2006 letter that he received from his father, and that every time that happened What we have to show, of course, is a clear probability that he faces the prospect of torture. But, you know, here we have regulations that implement the CAT that provide no presumption of future torture, even if the applicant has been tortured in the past. I mean, of course, his past torture is relevant, but the evidence appears to be undisputed that once he actually relocated in the country, he did not face torture or ongoing threats. And it would seem that many of the other peasants that were involved in that particular uprising remain on the land and are cultivating it without incident. So, you know, given the absence of fresh evidence of danger  and he was able to remain safe by relocating elsewhere, the BIA's determination that he failed to demonstrate a clear probability of torture seems to be supported by substantial evidence. Yes, Your Honor, it does seem that way. However, as noted, when he returned in 2007, when he was deported the first time, he couldn't even get out of the airport before he was taken by police who beat him and extorted him for money. And that, as noted, was not directly connected to his land invasion. They had threatened to release a file on him. And with Avelio Martinez still on the land and his two sons in the police department, they could have found him. They could have relocated him. And what evidence do we have? Maybe you were trying to tell us this earlier and I just didn't get it, but evidence that he was still at risk and threatened after he relocated. I thought he was kind of basically on the run until he left the country. Yes, he was on the run. There is evidence that he states in his testimony that a car with tinted windows was following him. Was that after he relocated? He relocated to a second village initially and then he relocated to another village. And I believe it was after he relocated, Your Honor. Okay. And then if we look back at his original asylum application, there is an indication. There is an indication that one of his friends was abducted by police and tortured because they wanted to know to find him. Yes, Your Honor. Thank you. I see that I'm out of time, Your Honors. If there are any further questions. But I will give you all the time that was originally allotted for the rebuttal, so don't worry about that. All right. Thank you very much, Your Honors. Okay. Thank you. Hello, Ms. Wright. Good morning, Your Honors. May it please the Court. My name is Jocelyn Wright. I'm here on behalf of Respondent, the United States Attorney General. The two issues before the Court are whether the Court has jurisdiction to entertain Mr. Estrada's challenges to the particularly serious crime determination, and second, whether the record compels reversal of the Board's denial of his request for CAT deferral. And on that issue, there's a subsidiary argument that the government makes regarding jurisdiction, but I will get to that when I address that issue. Turning to the particularly serious crime issue, our position, of course, is that the Court lacks jurisdiction to review that because it is a matter that is entrusted solely to the discretion of the Board of Immigration Appeals, and therefore it is not reviewable by the Court. And the Court's jurisprudence supports that view, and I'm citing for this proposition Ali, which we also cite in our brief, where the Court stated that determinations regarding whether a crime is particularly serious is something that goes to the agency's discretion and not something that the Court reviews because the statute and the regulations entrust that determination solely to the discretion of the Board. However, petitioners in their reply brief have come back and argued that Krukana in Section 242A2B, Romanet 2, somehow extends or takes that ruling into question, and I submit that that argument is misdirected. We are not relying on 242A2B, Romanet 2, as the jurisdictional preclusion in this case. What we are arguing is that 242A2C, the criminal alien bar, which restricts the Court's review to questions of law and constitutional issues, that's the bar that operates to restrict the Court's jurisdiction over the discretionary determination regarding whether a misdirected status crime is a particularly serious crime. But addressing the legal claim that they've advanced, that the Board has somehow misapplied the regulation, I mean, excuse me, misapplied the test for determining whether a crime is particularly serious, it's the government's view that the Board here did apply the correct test. It cited matter of NAM. There's no dispute that matter of NAM is the correct test. The matter should end there. The specific arguments that they've raised go to a disagreement with the Board's weighing of the factors in this case. There was no testimony or evidence that was ignored. What the Board did was consider all of the factors and say that the nature of the conviction, the type of the sentence imposed, and the circumstances and the underlying facts of the conviction all lead to the conclusion that this was a particularly serious crime, and its decision at Administrative Record, pages, excuse me, at pages 5 through 6, the Board has set forth its weighing of the factors in this case. And I also point out that in the Court's decision in Ali, the Court stated explicitly that once the Board puts the correct standard into play, then the Court's inquiry ends there. Because otherwise, the Court would be, if the Court goes to review, goes on to review whether the Board applied the correct test correctly, then the Court's jurisdiction would exist where the Board did it wrong, but would not exist where the Board did it right. And that kind of capriciousness regarding the Court's jurisdiction simply can't be sustained. So again, under Ali v. HM, the Court's, in this Court's precedent, the government submits that the particularly serious crime issue is not on the table because it's not subject to review, and it should be dismissed for lack of jurisdiction. Turning to the cat deferral question, we acknowledge that under the Court's jurisprudence, it retains jurisdiction to review the merits of the cat deferral claim. We do respectfully preserve our objection to that rule, and we direct the Court to the Second Circuit's decision in Ortiz-Franco for the reasons why. Why do you believe the Second Circuit's approach is the correct one? Because the Second Circuit's approach is consistent with the language, the plain language of the statute itself, which says that, and the scheme that Congress put into place when it enacted the Illegal and Immigration Reform Act of 1996, the Real ID Act of 2005, as well as the Foreign Affairs Regulation and Reform Act, which implements the Convention Against Torture. When those, given the whole statutory scheme with those, all those different statutes are put into play, the Second Circuit's decision harmonizes and kind of explains why those, why the government's reading of the statute, the jurisdictional preclusion, is lockstep with Congress's design of the congressional statute. So, for example, this Court has stated in Wanjiru and in Lignyak that the reason the Court retains jurisdiction to review the merits of a cat deferral denial is because it is a, it's between a final, it's similar to like a preliminary injunction, in that it's final enough for review, but not sufficiently final to deprive the Court of jurisdiction under 242A2C. So, and the reason the Court did that, I believe, is because it expressed a concern that the lack of judicial review is problematic. But the Second Circuit's rationale in Ortiz-Franco actually explains that the view that 242A2C and D operate to preclude review of the merits of a cat deferral denial is consistent with the judicial review concern that the Court expressed. And the reason is, under 242A, the Court's jurisdiction exists only insofar as there is a final order of removal. 242A4 says that any review of any cat-related claim is within the exclusive jurisdiction of the Court of Appeals. And so 242A4 provides the means by which judicial review of a cat claim can be obtained in the Court of Appeals. However, that subsection is also subject to the limitations of 242A2C, which says that the Court's jurisdiction when it comes to certain petitions for review brought by criminal aliens is limited to questions of law and constitutional issues. And so 242A4 is not a grant of jurisdiction. It doesn't expand that jurisdiction beyond what 242A2C and D in tandem provide already for all criminal aliens. All it says is, this is the means by which you can get cat deferral review, but the scope of that review is dictated by 242A2C and D. And so if the Court's, as the Second Circuit explained, and this is a long answer to your question, Your Honor, if the Court treats a denial of cat deferral as not part of a final order of removal, then under 242A1, the Court would lack jurisdiction over the entire claim. It has to dismiss for lack of jurisdiction because the Court's review, Congress has conditioned the Court's review to be attached to a final order of removal. But if it is a non-final order of removal, then the Court can't review it at all, period, even if there are legal or constitutional issues that have been raised. And so the Second Circuit understood that because those are the only issues that any Court of Appeals can review when it comes to a criminal aliens petition for review. The fact that it can't review the merits is not dispositive, and it doesn't offend due process, but it actually is more consistent in preserving judicial review if the Court reads, doesn't read the limitations of 242A2C and D to preclude or to allow it to review the merits of a cat deferral denial. But turning to the merits of the cat deferral itself, the Board in this case does owe some degree of deference to the immigration judge's finding, but in this case it applied the correct standard of review when it found that the immigration judge clearly erred when she concluded that Mr. Estrada had established a clear probability of future torture should he be returned to Honduras. And in this case, there is no evidence of future torture at all. He was mistreated, granted he was mistreated. We've got past torture. Yes. His nemesis is still there. Yes. Still has police connections. There's evidence that he was still actively looking for Mr. Estrada. All that's true, right? I'm not so certain about the last one. Are you referring to the 2006 letter, Your Honor? I'm referring to the several points about the efforts to find him as reported in the original asylum application as well as the letters in 2006 and 2014. And where it looks like the only way he avoided torture when he was in Honduras was by relocating and then leaving the country. In addition, we have the country conditions reports, which are perfectly consistent with petitioners' claims. So given all that, you're in an unusual position in this case. Usually your office is telling us to defer to credibility findings and factual findings of immigration judges, and we try to do that. And here, when I do that, I see pretty good reasons that support the finding of a clear threat of future torture if Mr. Estrada is returned to Honduras. I see that my time is up. I'd like to answer the court's question. Please. Fourth, what we're asking the court to do is to defer to the board's correction of the facts. Isn't the question of whether factual findings are clearly erroneous itself a question of law? We deal with that all the time. Well, but we're asking the court to, but again, it does that in the context of review of a district court decision. Is this any different? This is slightly different, Your Honor, because the board here is not an Article III court that's under the court's supervision. It is a co-equal branch of the government. And so it's an executive agency with equal authority, and, in fact, entrusted by Congress with the authority over immigration issues. And so to the extent that a co-equal branch of government has made these factual determinations, we suggest that the court's review is substantial justice. I understand. The board's own regulations, however, say it acts in an appellate capacity, not as a fact finder de novo, and it applies a clearly erroneous standard. That's correct, Your Honor. So whether it is applied that correctly would seem to me to be a question of law. Yes, but at the same time, we would ask whether the board applied the correct standard is a question of law, but its application of that standard, we believe the court should defer to apply the substantial evidence standard to whether or not the board's corrected findings, substantial evidence supports the board's corrected findings. So as you understand it, the standard is whether substantial evidence supports the board's finding of clear error in the immigration judge's factual findings? Yes. That's a somersault I'm not sure I can manage. Oh, but in this case, Your Honor, perhaps you don't need to reach it, because there is no dispute. Petitioners themselves don't dispute the board's conclusion, the board's determination that the immigration judge, that there was no, that he has been able to relocate in the future. And so given that he was able to relocate in the future, I mean was able to relocate to avoid any torture, and again in this case, no torture has been proven. Perhaps persecution was established in 1995 when he was granted asylum. You don't think that counts as torture, what the evidence showed in 1995? The board has not spoken on that issue, Your Honor. The immigration judge has. The immigration judge made that finding. The board did not find that was clearly erroneous. Well, the immigration judge didn't make a finding on torture, Your Honor. Torture didn't come into play until the enactment of FARA. When he was granted asylum in 1995, it was asylum and withholding were the standards of persecution, not torture. And I want to make that very clear. And so any harm to the city. Thank you so very much. And Mr. Ovid, come on up, and we're going to give you four minutes because we gave the government some extra time. Let's see if you can do it. Thank you, Your Honor. I just want to address a couple things that the government discussed or clear up some misunderstandings or unclear points from the previous counsel who spoke. One was we talked about the issue of I believe it was a question you asked where you were asking about the peasants that still live on the land and what do we make of the fact that as of this time they're still unmolested. Well, the record reflects the fact that the record being the letter that Estrada received from his father as well as the conversation that Mr. Estrada overheard when he was being tortured reflects that Mr. Martinez held Estrada personally responsible. And this is reflected not only in the conversation that he overheard where Martinez was talking about how ungrateful Estrada was. Is Martinez Avila's? Yeah, Avila Martinez, yes, not Estrada Martinez. Sorry for the confusion. But he was having this conversation with the police when they were torturing Mr. Estrada about how ungrateful Mr. Estrada was to have done this. And in addition to this, the other campesinos who were seized along with Mr. Estrada were held for a much shorter length of time. They were treated much less harshly than he was and they were released weeks before Mr. Estrada was able to be released from torture. So this disparate treatment really reflects the fact that he has been targeted as the leader of this campesino movement and that's why these peasants, they have strength in numbers, they're still living on this land, whereas he was kicked out of his home when he was released and basically chased around the country and had to stay one step ahead of these guys. And after he relocated, you know, he was followed by the cars with the black tinted windows and he had to stay on the run because he was afraid he was going to get caught again. My co-counsel referred to the fact that the intelligence service of Honduras had seized one of his friends and interrogated this fellow to try and determine the location of Mr. Estrada, which again points to this sort of ongoing pursuit that they had while he was still within the country. And the evidence is that torture was used to try to extract that information? The only evidence on that point is what Mr. Estrada said in his asylum application. Okay. It is correct that the immigration judge found as a fact in 2014 that not only the petitioner but also his colleagues had in fact been subjected to torture back at the time of the original removal, right? Yes. Yes, it was torture. Now, one of the things that the government talked about was this particularly serious crime determination and talking about how it wasn't reviewable because the BIA, you know, they weighed the factors and we just don't like the way that they weighed them. However, the particularly serious crime determination that the BIA has made is reviewable so long as there's a question of law. And it is our position that there is a question of law due to the BIA's misapplication of the test from INRI and AM where they essentially discarded all factors except for this impermissible categorical appraisal of the seriousness of the crime. I mean, you look at the decision that the BIA made and they say that she's between the ages of 13 and 16. Henceforth, she's a member of a class that is entitled to substantial or substantial legal protections. Hence, it's a particularly serious crime. That leaves no room for any sort of individualized analysis of the facts or anything like that that is required by the INRI and AM factors that are set forth, nor does it comport with the congressional mandate that they conduct this individualized determination. Thank you. Is there anything else you want to add? Yes. Lastly, the immigration judge found Mr. Estrada credible and he was found credible in front of two different immigration judges as well as in a credibility determination hearing. He presented evidence he's going to be tortured if he's sent back. They found him credible and his evidence credible. And accordingly, this Court should recognize the fact that it's more probable than not he's going to be tortured if he's sent back. And he's entitled to withholding a room deferral. All right. Mr. Wachowiak and Mr. Alville, you were appointed to take this case, and you have the great thanks of the Court for doing so. And I must say, you can go back to West Virginia and feel very proud of the way you've conducted yourself, the briefs, and the way you've argued. And, of course, Ms. Wright, you can go back to the Department of Justice and you have served your client well as well. This case will be taken under advisement.